# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BASE OPTICS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 9803-VCG |
| | ) |
| YAPING LIU, individually and on behalf | ) |
| of ARGUS INTERNATIONAL LTD., | ) |
| and ARGUS INTERNATIONAL INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Date Submitted: February 20, 2015
Date Decided: May 29, 2015

Joanne P. Pinckney and Seton C. Mangine, of PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware, *Attorneys for Plaintiff.*

John G. Harris and David Anthony, of BERGER HARRIS LLP, Wilmington, Delaware, *Attorneys for Defendants.*

**GLASSCOCK, Vice Chancellor**

As of 2013, Defendant Yaping Liu was a one-third owner of the equity in, and CFO and a director of, Base Optics, Inc. ("Base Optics"), a Delaware corporation involved in optics design and sales. She was also the sole owner of Defendant Argus International LTD ("Argus"), another optics sales company incorporated in the state of Washington. Argus was a small operation with an established customer base and large outstanding debt. Liu found herself overwhelmed attempting to service Argus's customers. She reached a deal with the two other principals and owners of equity in Base Optics, John Myrick and Lars Sandstrom, wherein Base Optics would acquire Argus's customer list and the right to do business with those customers "as Argus," and Argus would retain its debt and the right to receive a royalty of 50% of profits on sales by Base Optics doing business as Argus ("Base DBA Argus") arising from the customer list. The principals did not obtain the assistance of counsel in drafting this agreement, and none seemed concerned about potential conflicts of fiduciary duty concerning Liu's dual role as director of Base Optics and sole owner of its competitor/contractual partner, Argus. In practical terms, Liu retained the Argus debt, Base Optics took over operation of the Argus business, and Liu received two-thirds of the profits, half from the royalty agreement and her residual one-third of the remainder as an owner of Base Optics equity.

1

Unfortunately, Liu quickly fell out with Myrick and Sandstrom over the appropriate distribution of profits between Base Optics and Argus. Within weeks, Liu proposed, and Base Optics accepted, an amendment to the parties' agreement. In the amended agreement, Argus waived its right to royalties, Base Optics received the entire right to do business as Argus with the existing Argus customer list, with a single exception, and Base Optics was entitled to retain all profits from sales to those customers. The exception involved one of Argus's largest customers, Synergy International Optronics LLC ("Synergy"); that account was returned to Argus, which would henceforth service the Synergy account itself and retain all Synergy-generated profits. Like the original agreement, the amended agreement was drafted without the assistance of counsel and is rudimentary in its language. To again restate in practical terms, Liu went from the sole owner of an entity, Argus, with a valuable customer base, which she was unable to service on her own, and substantial debt, to the sole owner of an Argus with the same debt and a single customer, Synergy; at the same time, Liu was a one-third owner of Base Optics, which had acquired the right to the bulk of Argus's business, including the right to all profits therefrom.

It was not long after the amendment that Liu began to experience seller's remorse. Her relationship with Myrick and Sandstrom became adversarial, and they removed her from Base Optics' board of directors. Liu began to take the

2

actions described in detail below, purportedly in breach of her contractual, statutory, and fiduciary duties to Base Optics. Base Optics has sued for injunctive relief and damages on numerous theories, and the matter came before me on a two-day trial. This is my post-trial Memorandum Opinion.

## I. BACKGROUND FACTS[1]

The following are the facts as I find them after trial, by the preponderance of the evidence

### A. The Parties

Plaintiff Base Optics is a Delaware corporation created in 2012 by Myrick, Sandstrom, and Liu. In the early 2000s, Myrick and Sandstrom met Liu through their common involvement in the photonics industry.[2] At the time, Sandstrom and Myrick worked for one of the leading U.S. designers and manufacturers of optical equipment, Thorlabs, Inc. ("Thorlabs"). Liu was then the proprietor of Y&M Technologies, Inc. ("Y&M"), a Delaware corporation that acted as a sourcing intermediary between Chinese optics parts manufacturers and U.S. consumers, including Thorlabs. In 2011, Myrick and Sandstrom struck out on their own to form Base Optics—"a catalog photonics company" that also "does custom design

---

[1] Citations to the parties' joint trial exhibits appear as "JX." I note that two of the principal figures in this case, Yaping Liu and Lars Sandstrom, are not native English speakers, which is at times reflected in their testimonies and correspondences and in the parties' contracts. Unless otherwise indicated, all quotations taken from the record appear in their unedited form. No disrespect to those individuals in intended.

[2] Generally, photonics is the study of light and its generation, transmission, manipulation, and detection. *See* Trial Tr. 5:10–15 (Myrick).

as well as custom manufacture of optical components and photonics equipment."[3] The following year, they reincorporated Base Optics, originally a Maryland limited liability company, in Delaware, at which time they also brought in Liu to gain access to the network of suppliers, manufacturers, and customers she had cultivated after years as a broker in the photonics industry. All three were issued equal shares of Base Optics stock and named directors; in addition, Myrick became Base Optics' Chief Executive Officer and President, Sandstrom became its Chief Technology Officer, and Liu became its Chief Financial Officer.

Shortly after forming Base Optics in Delaware, Myrick and Sandstrom learned that Liu was a partial owner of another optics company incorporated in Washington and headquartered in Delaware, Defendant Argus (together with Liu, the "Defendants"),[4] which was experiencing financial troubles. Liu engaged Myrick and Sandstrom to advise Argus on its business, during which they found that Argus owed hundreds of thousands of dollars to its vendors, including a large

---

[3] *Id.* at 7:1–4 (Myrick).

[4] I note that Base Optics brought this action against Liu individually and on behalf of Argus International LTD and a company called "Argus International Inc.," including the latter entity because its name appears in the signature block of one of the operative contracts in this dispute. *See* Compl. ¶¶ 7, 22. However, the listing of "Argus International Inc." in that signature block was a scrivener's error, according to the Defendants and evidenced by the fact that the contract in which that signature block appears also states in the recitals that the contract is between Base Optics and Argus International LTD. Answer ¶ 22; JX 22 at 1. It is not clear from the record whether an entity named Argus International Inc. even exists, and in any event Base Optics has abandoned its pursuit of claims against Argus International Inc. *See generally, e.g.*, Pl.'s Pre-Tr. Opening Br. (omitting Argus International Inc. from the cover page, defining "Defendants" to only include Liu and Argus International LTD, and failing to once reference Argus International Inc.). Thus, I define "Defendants" to include only Liu and Argus International LTD and do not make any ruling as to the liability of Argus International Inc.

portion to Liu's own companies, Y&M and a company the parties refer to as "Accina." The parties also believed that Argus was being bled by Liu's co-owner, non-party Brian Morrisey, who had purportedly been diverting Argus's cash and customers for personal gain. In May 2013, Liu bought Morrisey out of Argus, becoming its President, Chief Executive Officer, and sole owner.

## B. The DBA Arrangement

With Morrisey gone, Liu required more help from Myrick and Sandstrom to service Argus's clients. By the summer of 2013, Myrick and Sandstrom were working so much on Argus's business that they feared Base Optics' growth would be stunted. However, Myrick and Sandstrom saw potential in Argus's healthy client base, so, rather than pull away from Argus, they began negotiating with Liu as to potential arrangements between Base Optics and Argus that would benefit both companies. Rather than a merger, the parties eventually settled on a "doing business as" (or "DBA") arrangement they hoped would allow Base Optics to service Argus's then-current customer base, ideally generating profit for both companies but without requiring Base Optics to assume Argus's debt.[5] Base

---

[5] *See* JX 10 (email from Sandstrom to Liu dated June 7, 2013) (proposing terms whereby Base Optics would pay a 50% royalty to service Argus's customers as "Argus International" and explaining, "Our motive for doing this is that we can use one set of resource to serve both Base Optics and Argus. Yaping get return on her investment and opportunity to pay back Argus Int Ltd vendors while Base Optics is protected from past liabilities. New transactions all go through Base Optics assuring better vendor relationships going forward."); JX 11 (email from Liu to Myrick dated June 10, 2013) ("I told Lars I am OK with the proposal . . . . Argus is not a healthy company right now, the only good thing is it has customers, that is why I save the customer first

5

Optics' ability to do business as Argus—in other words, to represent itself as Argus to customers—was paramount to its ability to service Argus's customer base in this arrangement, because only Argus, not Base Optics, was qualified to sell to a "vast majority" of Argus's customers, particularly defense contractors and government bodies, under those customers' strict vendor-qualifying processes.[6]

On June 11, 2013, Base Optics and Argus, via Myrick and Liu, executed a rudimentary written agreement memorializing their collaboration, using a form contract Myrick had downloaded from the Internet and altered to reflect the parties' negotiated terms (the "Original Agreement"). As to Base Optics'

---

and trying to make the customer more comfortable. I am sure we need some legal agreement to protect Base Optics and I do not want Base Optics gets hurt. Argus is already missing legs or arms, need a lot of work.").

[6] *See* Trial Tr. 19:1–12 (Myrick) ("Q: You said that Base registered to do business as Argus. Why was that important? A: Because the Argus customers had been—Argus was an established company, and some of the Argus customers actually needed to do business with Argus exclusively; either Argus had gone through a long qualification process to be part of their vendor [b]ase or Argus had been approved with—the military is a good example. You become an approved vendor, and you can't just go switch those orders to someone else, so you had to do business as Argus to service those customers."); *id.* at 232:19–233:9 (Perry) ("Q: What [domain names] do you use for email? A: We use the @BaseOptics.com and @ArgusInternational.com. The Base Optics I use for our catalog company, our website. That's where that line of business, the communication comes from. But we needed the Argus International email address as well simply because that's what those customers are accustomed to. A vast majority of them can only do business with Argus International, whether it be approval of the Argus International email address or the CAGE code, or there's been a qualifying process for Argus that these customers— I can't just suddenly start contacting them as Base Optics. That's just not something that's feasible."); *cf. id.* at 249:6–250:1 (Perry). A CAGE code, short for Commercial and Government Entity code, is a unique identifier issued by the federal government to identify government entities and suppliers. *Id.* at 51:23–52:2 (Myrick). When government agencies purchase supplies, they use CAGE codes to validate that those supplies are produced by approved entities. *See, e.g., id.* at 231:5–10 (Perry) (explaining that when selling parts to the federal government, or to a private entity that will in turn sell those parts to the federal government, "the CAGE codes need to trace all the way through the production").

obligations in the DBA arrangement, the Original Agreement provided that Base Optics would:

> (a) address Argus current customer-base as "Argus International" by registering Doing Business As (DBA) "Argus International"[;]
> (b) pay a royalty of 50% of the net profit from "Argus Customer Sales" (net profit = Sales − (Raw Materials + Shipping)) for 10 years to Argus[;]
> (c) attain the proper registration to support Argus'[s] current type of business[;]
> (d) set up Base Optics ERP [accounting] system to be able to separate "Argus Customer Sales"[;]
> (e) pay a minimum of $600/week to Yaping, John, and Lars using the funds deposit by Argus[; and]
> (f) support Argus with business advice to maximize the royalty.[7]

As to Argus's obligations, the Original Agreement provided that Argus would:

> (a) pay $18,000 to Base Optics to be used to cover interim salaries for the first 10 weeks[;]
> (b) transfer its customer-base to Base Optics from this point going forward Base Optics owns the customer-base[;]
> (c) transfer all open sales orders and new orders in Argus Quick Books to Base Optics[;]
> (d) ensure that Brian Morrisey does not contact or in any other way solicit business from the transferred customer-base or damage the customer relation (including legal action)[; and]
> (e) allow Base Optics to use all Argus trademarks, service marks and trade names.[8]

The term "Argus Quick Books" in the Original Agreement referred to the accounting software QuickBooks, which Argus used to manage the entirety of its business, including for bookkeeping and for storing its customers' information and

---

[7] JX 12 § 1.
[8] Id. § 2.

history.[9] The term "customer-base" refers to those customers with which Argus had previously done business at the time of the transaction (the "DBA Customers"),[10] a list of which Argus stored in QuickBooks.[11] In the weeks leading up to the Original Agreement, Liu had granted Sandstrom access to Argus's QuickBooks account in his role as a consultant, and Sandstrom maintained that access following the execution of the Original Agreement, using QuickBooks alongside Liu to manage Argus's business.[12]

C. *The Amendment—It Becomes All About the Base . . .*[13]

The ink on the Original Agreement had hardly dried when the parties began having issues with their arrangement. On July 13, Liu emailed Myrick and Sandstrom explaining that she was overwhelmed by customer orders and the complexity of the payment and royalties scheme.[14] Liu proposed a change to the parties' arrangement whereby the parties would abandon the royalties system, allow Argus to solely service and retain all the profits from one of the historically larger DBA Customers, Synergy, and allow Base DBA Argus to service and retain

---

[9] *See, e.g.,* Trial Tr. 305:15–21, 348:4–19 (Liu). Liu testified that the information Argus stored in QuickBooks was, at least at the time she took over Argus, its most significant asset. *Id.* at 305:15–18 (Liu).

[10] *Id.* at 28:6–20 (Myrick); *see also id.* at 305:19–306:3, 314:17–315:11 (Liu) (disputing that the Original Agreement effected a sale to Base Optics of the exclusive rights to service the customers listed in Argus's QuickBooks, but acknowledging that the customers listed in Argus's QuickBooks are those customers referred to in the Original Agreement).

[11] *See* JX 131.

[12] *See, e.g.,* Trial Tr. 184:4–15, 203:16–204:3 (Sandstrom); *id.* at 320:1–19 (Liu).

[13] About the Base, no Argus.

[14] *See* JX 13.

all of the profits from all of the other DBA Customers.[15] Myrick and Sandstrom were amenable to the change, but were concerned that Argus owed Base Optics money under the terms of the Original Agreement. Following the parties' execution of the Original Agreement, a number of the DBA Customers had continued to send payments to Argus rather than Base Optics, which payments Myrick and Sandstrom argue the Defendants failed to remit to Base Optics.[16] Thus, although the Original Agreement contemplated a system where royalties would flow from Base Optics to Argus, no such royalties were ever paid; rather, by October 2013, Sandstrom calculated that Liu had deposited so many payments from DBA Customers directly into Argus's bank account that Argus actually owed Base Optics approximately $18,000.[17] When confronted by Myrick with this

---

[15] *Id*; *see also* JX 19 (embedded email from Liu to Myrick dated Oct. 3, 2013) ("I propose to take care Synergy[,] one customer to manage to pay Argus owe YMT ($170,000); YMT owes KK about $80,000 for this item. Maybe it will be a couple of years to do pay everything back. I still own Argus and work on all other customers and venders of Argus, but Base Optics takes all the profit, then we do not have the problems of dividing 50% profit. Base Optics is also my company, I hope this helps out current cash flow problems. Base Optics will get more than 50% profit by doing this, then we do not have the "division" I think the problems is coming from there. In this way, Lars have better view of accounting and take care of all customers.").

[16] Myrick and Sandstrom were able to view deposits into Argus's bank account via a Mint.com account, which they had access to and which was linked to Argus's bank account. Trial Tr. 80:3–9 (Myrick).

[17] *See, e.g.*, JX 19 (email from Myrick to Liu dated Oct. 3, 2013). It is not clear from the testimony of Myrick or Sandstrom whether this $18,000 figure accounted for orders previously paid for by Argus versus those paid for by Base Optics, which would determine, respectively, whether Base Optics would be entitled to only a 50% split of the profit or whether it would also be entitled to the cost of the goods. Thus, although the parties refer to this specific debt using various names, such as "royalties," "back royalties," and "overpayments," I will refer to it as "back payments."

9

figure at the time, Liu denied that Argus owed that much money to Base Optics.[18]

She testified at trial that she did not believe then, and she still does not believe to this day, that Base Optics' calculation of Argus' back payments under the Original Agreement was correct.[19]

After a series of video conferences between Myrick, Sandstrom, and Liu, the parties entered into a written agreement amending the Original Agreement to reflect Liu's proposal on November 11, 2013 (the "Amended Agreement"). As its purpose, the Amended Agreement provided:

> The purpose of this amendment is to alter the division of customers in the [Original Agreement] to allow for simpler bookkeeping and the development [of] the clear delineation between customers that Base Optics services and . . . Argus International Ltd continues to serve. This change is at the request of Yaping Liu (the sole owner of Argus International Ltd) with the intent of freeing Argus to service top customer Synergy International Optronics[,] moving all other customers to Base Optics as compensation for maintaining Argus quickbooks, website, email and providing customer service, sales and technical support to these customers.[20]

The Amended Agreement entirely replaced Base Optics' obligations under the Original Agreement with the requirements that Base Optics would:

---

[18] JX 20 (embedded email from Liu to Myrick dated Oct. 9, 2013); *see also* Trial Tr. 106:14–20 (Sandstrom); *id.* at 327:21–332:9 (Liu). As support for her belief that Argus did not owe Base Optics the $18,000 figure quoted by Myrick, Liu pointed out to Myrick that, in just the few months that the Original Agreement had been in place, Argus had already transferred approximately $25,000 to Base Optics. *See* JX 20 (embedded email from Liu to Myrick dated Oct. 9, 2013); Trial Tr. 328:19–330:24 (Liu).

[19] Trial Tr. 327:21–332:9 (Liu).

[20] JX 22 § 1.

(a) address Argus current customer-base as "Argus International" by registering Doing Business As (DBA) "Argus International"[;]
(b) attain the proper registration to support Argus'[s] current type of business[;]
(c) pay the rent for [] Argus'[s] Scotts Valley office up to May 2014 ($1350/month)[; and]
(d) pay the Argus Bank of America line of Credit (approx. $17000)[.][21]

Further, the Amended Agreement entirely replaced Argus's obligations under the Original Agreement with the requirements that Argus would:

(a) transfer its customer-base to Base Optics from this point going forward Base Optics owns the customer-base except Synergy International Optronics which will continue to be maintained by Argus International LTD. This transfer has been paid for from royalties already paid in the [Original Agreement;]
(b) transfer all open sales orders and new orders in Argus Quick Books to Base Optics except Synergy International Optronics which will continue to be maintained by Argus International LTD[;]
(c) allow Base Optics to use all Argus trademarks, service marks and trade names[;]
(d) honor [the Original Agreement] through to date of this amendment[;]
(e) keep the business running until Base Optics see[s] no need for using Argus as a legal entity for business purposes[; and]
(f) take legal action against Brian Morrisey for damages he caused when he had a fiduciary relation with Argus.[22]

Sandstrom testified that Base Optics bargained for the new provision in subsection 2(b)(e), obligating Argus to "keep [its] business running" until Base Optics gave its permission for Argus to do otherwise, in order to, among other things, ensure Base Optics' uninterrupted access to Argus's CAGE code, which

---

[21] *Id.* § 2(a).
[22] *Id.* § 2(b).

11

was essential to Base Optics' ability to supply government entities among the DBA Customers.[23]

*D. Base Optics' Relationship with Liu Deteriorates*

Despite the Amended Agreement, the parties' growing pains persisted. In January 2014, Myrick and Sandstrom raised their own weekly salaries from $600 to $800, but chose not to raise Liu's salary because she was not working full time at Base Optics.[24] In February, Base Optics switched banks but did not add Liu as an authorized member on the new account, cutting off her authority to direct Base Optics' funds.[25] At a Base Optics board meeting on February 14, 2014, Liu resigned as Base Optics' CFO, purportedly because she was frustrated by her lack of access to Base Optics' new bank account,[26] and Myrick, Sandstrom, and Liu unanimously agreed to appoint Sandstrom as the new CFO.[27]

---

[23] *See* Trial Tr. 117:6–118:11 (Sandstrom) (explaining that subsection 2(b)(e) was "key" to Base Optics, because, "One thing was that [Base Optics] needed access to the CAGE code . . . because [Base Optics] knew that government[] solicitation needs to happen under that CAGE code for specific bids. . . . [G]overnment solicitation is close to [original equipment manufacturer] business [in] that once you have a working relationship, it's easier since you are qualified to get and solicit new business. To avoid like shutting down and starting from scratch with [Base Optics'] purchasing history, you will have less success rate. So the idea is to keep the CAGE code and continue to bid on the same CAGE code."); *id.* at 181:7–182:10 (Sandstrom) ("So what [subsection 2(b)(e)] says is since we need this CAGE code to do government bidding, we need the company alive. That is the understanding between the parties involved; that that is key to that. And if you shut down Argus once and for all, you lose that capability to use that number, and we didn't want to go into that."); *supra* note 6 (explaining the function of CAGE codes).
[24] Trial Tr. 69:9–70:9 (Myrick).
[25] *Id.* at 81:17–82:6 (Myrick).
[26] *Id.* at 337:18–338:9 (Liu).
[27] *See* JX 30.

Following the board meeting, Liu began expressing her frustration to Myrick and Sandstrom that she was not being compensated as they were for her work at Base Optics and that she again wished to change the terms of the parties' DBA arrangement.[28] Rather than raise her salary, Myrick and Sandstrom offered Liu a full-time, salaried position with Base Optics applying for government contracts, but Liu never pursued the position.[29]

It was around this time and in this context that, unbeknownst to Myrick and Sandstrom, Liu began to pursue the DBA Customers on behalf of Argus, with the intent of regaining the full benefit of the profits therefrom, in disregard of the Amended Agreement. From February to April 2014, Liu serviced DBA Customers through Argus without Base Optics' knowledge, including booking two orders for parts with Rocky Mountain Instruments ("Rocky Mountain")[30] and one with Sirchie Finger Print Laboratories ("Sirchie").[31] In addition, during this time, Liu received two checks from DBA Customers, Selectron Industrial Company ("Selectron") and Hach Company ("Hach"), that she failed to remit to Base Optics.[32] In emails traded in April 2014, Sandstrom demanded that Liu transfer those payments to Base Optics, while Liu asserted that the payments rightfully

---

[28] *See, e.g.,* JX 33 (embedded email from Liu to Myrick dated Feb. 26, 2014); Trial Tr. 118:14–119:16 (Sandstrom).
[29] *See, e.g.,* JX 35.
[30] *See* JX 40 (email and invoice from Argus to Rocky Mountain dated Apr. 25, 2014).
[31] JX 104 at 6, ¶ 2.
[32] Trial Tr. 31:19–32:13 (Myrick); *see also id.* at 339:6–340:15 (Liu).

belonged to Argus, as they compensated Argus for parts it had purchased on credit before the parties entered into the Original Agreement.[33] Base Optics also contended—but failed to prove—that Argus mistakenly received, and has retained, a shipment of parts ordered by Base Optics, specifically, eye caps used in binoculars.[34] Liu denies ever receiving the eye caps.[35]

As the spring wore on, the parties' relationship continued to deteriorate. Base Optics presented evidence that Liu contacted Base Optics' vendors of Chinese manufactured parts, with whom Liu had a prior relationship, and convinced them to revoke Base Optics' ability to purchase parts on credit, including King Kowok Optics Co., Ltd. ("King Kowok"),[36] and Shanghai Optiwise Inc.'s ("Shanghai").[37] Liu testified that she never told any vendor to require Base

---

[33] *See* JX 37; Trial Tr. 338:23–340:15 (Liu). *But see id.* at 67:4–68:18 (Myrick) (arguing that the check from Hach expressly stated that it was payment towards a Base Optics sales order). The dispute over the Selectron check ended up fading away, as Selectron canceled the check before Argus could cash it; Selectron later reissued a check directly to Base Optics. *Id.* at 67:8–19 (Myrick).

[34] *See* JX 36; Trial Tr. 119:17–120:13 (Sandstrom).

[35] Trial Tr. 372:1–19 (Liu).

[36] *See* JX 41 (email from King Kowok to Liu dated Apr. 28, 2014) ("As per our telecon this morning, attached please find the outstanding order from Base Optics which will be shipped on 5/16. Will change the payment terms to T/T before shipment."); Trial Tr. 123:1–9 (Sandstrom) ("We have been on really good payment terms with [King Kowok] for a long time. We always paid on time, and suddenly I see here [in JX 41] that we were put on prepayment. I understood in the litigation that it seems to be [Liu] that is behind the change of payment terms, which makes it difficult since it's a collaboration, and you don't expect to change payment terms since it affects your cash flow really negatively on a small business.").

[37] *See* JX 103 (showing an email chain between Sandstrom and Shanghai representative Gavin Wang, a longtime vendor of Chinese-manufactured parts to Liu's businesses, including Base Optics and Argus, in which Wang informs Sandstrom that due to certain unpaid Argus invoices, which Liu told Wang that Argus would pay off, Shanghai was requiring Base Optics to prepay on two pending orders; when Sandstrom responded that the orders in question were for Base

14

Optics to prepay on its orders, but admitted that she told some vendors to "be sure to get the payment" from Base Optics.[38]

By May 2014 the parties had become adversarial, principally over the DBA Customer payments withheld by Liu. On May 9, Liu emailed a contact at Hach and told him to halt Hach's business with Argus due to "some issues with the accounting within [Argus]":

> I was 50% owner of Argus from 2008 to May of 2013, after May I bought other 50% . . . of Argus [and] became 100% owner of Argus. I hired 2 consultants to manage and run the company for me, but they established an account "Doing Business as Argus International" which I could not get into it now. They forwarded the company address out and have received all checks from last year to the present but not manage to pay the vendors for the parts.
> I called a lawyer to consult how to handle this issues, so at this time, please stop all payments at this moment. I will let you [know] where to send Argus payments to avoid this situation. To make this situation even [more] complicated is that I am also the investor for the company that I hired the two consultants. That is why I hold this situation for almost a year until I feel sick of it and the vendors of the company keep contacting me for payments.[39]

Shortly after, Sandstrom called an emergency Base Optics board meeting to take place on May 19. When Liu failed to appear at the emergency meeting due to a

---

Optics, not Argus, Wang replied, "We really can't believe what you said above. The B270 and the sapphire customer is belonged to Argus, you and Base Optics is just help to manage Argus' customer and purchase the parts from the vendors through Base Optics, how can you say that the B270 order is your property?"); Trial Tr. 136:16–137:19 (Sandstrom). Sandstrom also testified that he believes Liu caused a Chinese vendor named "Reliance" to change Base Optics' payment terms to be less favorable, based on Liu's close business relation with Reliance and Reliance's abrupt change in position as to Base Optics' payment terms. *See id.* at 155:15–160:19 (Sandstrom).

[38] Trial Tr. 369:22–370:10 (Liu).

[39] JX 46 (embedded email from Liu to Kent Roberts dated May 9, 2014).

misunderstanding about the meeting's location, Myrick and Sandstrom acted in her absence to remove her from Base Optics' board and replace her with non-party H.C. Tang, who had recently invested in Base Optics.[40]

On June 1, 2014, Liu found that she was unable to access Argus's QuickBooks account; she immediately suspected that Sandstrom, the only other regular user of the account, had changed the password to cut off her access to Argus's business entirely.[41] On June 2, Liu moved Argus's Delaware office to a new office suite within the same office park,[42] pursuant to the orders of the office park management company from which Liu leased space for her various businesses.[43] Liu testified that following the move she notified several of the DBA

---

[40] *See* JX 50.

[41] *See* Trial Tr. 348:4–19, 349:22–350:11 (Liu). Sandstrom testified that Liu's access to QuickBooks, as well as his own, would occasionally be interrupted for a brief period due to QuickBooks' security requirement that the account password be changed every 90 days, and that he had changed the password himself pursuant to that security requirement at least once prior to June. *Id.* at 110:20–111:9 (Sandstrom). However, he did not testify as to whether he changed the password during this instance, only that he provided Liu with the new password the one time he remembers changing it, that Liu would regularly contact him when she forgot the password and in those instances he would immediately provide it to her, and that Liu never contacted him in June about being locked out of the account. *Id.* at 185:1–186:21, 218:22–219:4 (Sandstrom).

[42] Liu moved Argus from 1 Innovation Way, Suite 100, Newark, Delaware 19711 to 5 Innovation Way, Suite 300, Newark, Delaware 19711.

[43] *See* JX 52 (email from Delaware Technology Park to Liu dated May 29, 2014) ("I have been asked to find additional space at 1 Innovation Way for the University of Delaware Small Business Development Center and other UD entities. . . . What this will do is force me to move you from 1 Innovation Way to 5 Innovation Way."). This email is addressed to Liu at "Y&M Technologies, Inc.," but the record reflects that both Base Optics and Argus also used the 1 Innovation Way address. *See, e.g.*, JX 17.

Customers about the address change, but that she did not notify Base Optics because the parties were no longer in communication at that point.[44]

*E. Liu Hijacks the Email Accounts for Base DBA Argus*

Upset at being cut off from the DBA Customers, and harboring a suspicion that Base Optics had disabled her access to Argus's QuickBooks account and was stealing money from Argus, on June 4, 2014, without Base Optics' knowledge, Liu contacted Network Solutions, the company hosting Argus's website and email accounts, which services Base Optics paid for,[45] and reset the passwords for the Argus email accounts that Myrick, Sandstrom, and Jenna Perry Myrick ("Perry")[46] were using to conduct Base Optics' business as Argus (together, the "Argus Email Accounts").[47] Liu testified that she knew Base Optics utilized the Argus Email Accounts to communicate with the DBA Customers,[48] that she blocked Myrick, Sandstrom, and Perry's access to the Argus Email Accounts because she wished to take back the DBA Customers,[49] and that she pursued this course of action despite

---

[44] Trial Tr. 349:13–21 (Liu).

[45] *Id.* at 25:17 – 26:17 (Myrick); *see also* JX 22 § 1 ("This change is at the request of Yaping Liu (the sole owner of Argus International Ltd) with the intent of freeing Argus to service top customer Synergy International Optronics[,] *moving all other customers to Base Optics as compensation for maintaining Argus quickbooks, website, email* and providing customer service, sales and technical support to these customers." (emphasis added)).

[46] Jenna Perry Myrick, John Myrick's wife, worked for Base Optics at the time of these events. I refer to her as "Perry" to avoid confusion and also because the record reflects that she prefers to use "Perry" as a surname in business settings. *See* Trial Tr. 229:21–230:1 (Perry).

[47] *Id.* at 349:22–354:1 (Liu).

[48] *Id.* at 379:18–380:2 (Liu).

[49] *See, e.g., id.* at 381:8–11 (Liu) ("Q: You also wanted to take back those customers so you could pay Argus'[s] past vendor debt, isn't that right?  A: Yes.").

17

previously granting Base Optics rights to service the DBA Customers in the Original Agreement and Amended Agreement.[50] Liu also testified that at the time she changed the passwords for the Argus Email Accounts she believed she owned the accounts as a product of her ownership of Argus.[51]

Base Optics' loss of access to the Argus Email Accounts in early June 2014 abruptly halted Base Optics' business with the DBA Customers.[52] At trial, Perry explained that, whereas Base Optics largely conducts its Base Optics business through catalog orders—customers visiting Base Optics' website and ordering parts from a digital catalog—Base Optics largely conducts its Argus business through a quoting and purchase order system that is orchestrated entirely via email.[53] Moreover, Base DBA Argus specifically relied on the Argus Email Accounts, because most of the DBA Customers had authorized only Argus, not Base Optics, to serve as a supplier; indeed, the DBA Customers' restrictions on qualified vendors were the reason Base Optics initially needed to enter into the DBA arrangement with Argus in order to service the DBA Customers[54] and why Base Optics negotiated for an additional provision in the Amended Agreement

---

[50] *See id.* at 382:11–20 (Liu) ("Q: So you intended to get back the customers for Argus despite the amendment, correct? A: Yes. Q: And you intended to get back the Argus customers despite the original agreement as well, correct? A: Yes, because the agreement is saying that they are going to pay, but they never pay. If the payment is not in place, the agreement is not executed.").

[51] *Id.* at 354:2–15 (Liu).

[52] *See id.* at 233:20–234:9 (Perry); *id.* at 39:19–41:10 (Myrick); *id.* at 125:19–126:19 (Sandstrom).

[53] *Id.* 232:11–233:9, 236:7–21 (Perry).

[54] *See supra* note 6 and accompanying text.

18

requiring Argus to obtain permission from Base Optics before it could cease operating.[55] After losing access to the Argus Email Accounts, Myrick, Sandstrom, and Perry scrambled to contact a number of DBA Customers through other means, including by phone, their Base Optics email accounts, and even a newly created Gmail account with "Argus" in the address, but they found those customers unwilling, or unable, to conduct Argus business outside of the Argus Email Accounts.[56]

While Base Optics was occupied trying to figure out how to service the DBA Customers without the Argus Email Accounts, Liu was busy combing through the contents of those accounts. She enlisted two acquaintances—non-parties Joanna Davison and Greg Mulligan—gave them new Argus email addresses, and forwarded certain emails from the Argus Email Accounts containing customer information, such as purchase orders and quotations, to Davison, Mulligan, and herself so that they could service those accounts.[57] Based on these messages, Liu, Davison, and Mulligan reached out to several DBA Customers, including Sandia National Laboratories ("Sandia"),[58] General Atomics,[59] Hach,[60] and Bharat Electronics Ltd. ("Bharat").[61] Liu testified that she

---

[55] *See supra* note 23 and accompanying text.
[56] *See* Trial Tr. 39:19–40:7 (Myrick); *id.* at 126:20–127:10, 187:20–189:18 (Sandstrom); *id.* at 234:10–236:6 (Perry).
[57] *See, e.g.*, JX 57; JX 58; JX 65; JX 66; JX 75; JX 77; JX 79; JX 85; JX 97.
[58] *See* JX 59.
[59] *See* JX 64.

19

only directed Davison and Mulligan to assist DBA Customers with issues on open orders, and that she did not direct either Davison or Mulligan to make any new sales on behalf of Argus,[62] but the record reflects otherwise. For example, on June 11, 2014, Liu forwarded an email from Sandstrom's Argus email account to Mulligan, in which email Hach—a DBA Customer—requested a quote from Sandstrom for certain coated lenses, with the direction that Mulligan "read the following email and try [his] best to contact them and pick up the coating job."[63] In another example, Liu assisted Davison in resetting Argus's login information for Bharat's online bidding system so Davison could make future bids, which Davison subsequently did.[64] On one occasion, Liu herself attempted to solicit business from a DBA Customer from one of the Argus Email Accounts while posing as the actual account holder: On June 10, 2014, Liu sent an unsigned email from Sandstrom's Argus email account to Sandia, responding to Sandia's request for a quotation on parts and directing Sandia to direct all future requests for quotations

---

[60] See JX 68; JX 77.

[61] See JX 80; JX 81; JX 97.

[62] Trial Tr. 360:3–361:19 (Liu).

[63] JX 65; see also JX 66 (showing an embedded email from Measurement Science Enterprise, Inc. ("Measurement Science") to Argus requesting a quote on parts, which Liu forwarded from Sandstrom's Argus email account to Mulligan with the direction to "contact to pick up this job"); JX 79 (showing an embedded email from National Research Council Canada to Argus requesting a quote on parts, which Liu forwarded from Sandstrom's Argus email account to Davison on June 17, 2014 with the direction that Davison "continue" providing the quote).

[64] See JX 81 (embedded email from Bharat to Liu dated June 18, 2014, showing that Liu had reset the Bharat login password and providing the new password, which Liu forward to Davison the same day); JX 97 (email chain between Bharat and Davison concerning an order of parts in June and July 2014).

to email addresses held by Liu, Mulligan, or Davison.[65] In short, despite her testimony, Liu actively attempted to solicit business for Argus from DBA Customers.

Among the many emails that Liu forwarded from the Argus Email Accounts was an email from Perry to the Aviation Commodities Division of the U.S. Department of Defense's Defense Logistics Agency (the "DLA")—a DBA Customer—that included Base DBA Argus's final bid for a contract supplying a certain optics part to the DLA (the "Government Bid").[66] After failing to secure a vendor for this part through an open solicitation, the DLA had specifically contacted Perry to solicit the Government Bid because Argus had supplied this same part in the past,[67] and at the time both Perry and Liu believed that the DLA was likely to accept the Government Bid and award Base DBA Argus the contract.[68] Liu testified that she forwarded herself the Government Bid because she planned on fulfilling it herself through Argus once it was accepted by the DLA,

---

[65] JX 59. Liu testified that she thought she was sending this email to Sandia from her own Argus email account, and thus that she did not intend to impersonate Sandstrom. Trial Tr. 384:14–385:18. However, I do not find Liu's testimony in that regard to be credible. Liu copied her own Argus email account when she emailed Sandia from Sandstrom's Argus email account, clearly indicating that she was aware of which account her email was originating. *See* JX 59.

[66] *See* JX 85.

[67] Trial Tr. 255:20–256:15 (Perry).

[68] *See id.* at 279:19–280:11, 284:3–286:5, 287:15–19 (Perry); Liu Dep. 299:15–16 (stating her belief that, because Base DBA Argus quoted such a low price in the Government Bid, it was "more than likely" to be awarded the DLA contract). The parties have jointly lodged Liu's deposition with the Court, and Base Optics cites to that deposition it its post-trial opening brief without objection from the Defendants.

and that she also forwarded a copy of the Government Bid to a contract officer at the DLA, with whom Liu had scheduled an appointment to discuss her plan to fulfill the Bid.[69] Meanwhile, upon losing access to her Argus email account, Perry had contacted the DLA asking whether, due to her uncertainty as to Base Optics' future ability to represent itself as Argus through the Argus Email Accounts, she should withdraw and resubmit a bid for the solicitation as Base Optics or move forward with the Government Bid as Base DBA Argus.[70] The DLA, on advice from counsel, notified Perry on June 11, 2014 that the offer must be withdrawn "since the offeror cannot perform as Argus."[71] Months later, the DLA approved Base Optics as a vendor for the part in the Government Bid and re-opened the solicitation for that part.[72] Base Optics attempted to put together a bid using only its own resources, but ultimately the DLA cancelled the second solicitation before Base Optics could finalize its new bid.[73]

During the period that Liu had control of the Argus Email Accounts, she also interfered with Base Optics' access to payments from DBA Customers. On June 11, 2014, Liu directed Sirchie to stop sending payments to Argus until Sirchie

---

[69] Trial Tr. 387:5–389:6 (Liu).
[70] *See* JX 55.
[71] JX 63; *see also* Trial Tr. 245:1–12 (Perry).
[72] Trial Tr. 245:19–246:8 (Perry).
[73] *Id.* at 246:9–247:18 (Perry); JX 113.

received further notice from Liu.[74] Liu also never informed Base Optics that Argus's Delaware office address—the payment address—had changed.[75] Base Optics was unaware that Liu had directed certain DBA Customers to send payments to a new address until June 13, 2014, when Sandstrom contacted Hach through his Base Optics email account to inquire into overdue payments, only to find out that Liu had told Hach to send the payments to Argus's new address.[76] In total, through June of 2014, Argus received and withheld seven checks from Hach for $405.00 each, including the check that sparked the parties' dispute in April.[77]

Liu, Mulligan, and Davison additionally made a number of representations to third parties concerning Base Optics, Myrick, Sandstrom, and Argus, a number of which were misleading. In several of their initial communications with DBA Customers, Liu, Mulligan, and Davison represented that Sandstrom had left Argus.[78] They also began telling DBA Customers that Argus would be merging

---

[74] See JX 62 (embedded email from Liu to Sirchie dated June 11, 2014) ("Please hold any payments to Argus, our sales office still remains in Delaware, but our manufacturing and accounting Department are moving to Fremont, California. I will inform you as soon as it settles in."); Trial Tr. 407:19–408:2 (Liu).

[75] See supra note 44 and accompanying text.

[76] See JX 71 (email chain between Hach and Sandstrom showing that Hach was getting "conflicting information on what [it] need[s] to do" in regards to paying the invoices, and that Hach had changed the payment address to the new office location address after receiving a phone call from Liu); Trial Tr. 123:15–124:22 (Sandstrom).

[77] See JX 129; Trial Tr. 140:20–141:3 (Sandstrom).

[78] See, e.g., JX 64 (email from Mulligan to General Atomics dated June 11, 2014) ("I am the new sales engineer taking over for Lars. I am located in Northern California and will be handling our West Coast contacts. I have the request in to see if we can honor the past pricing and will advise shortly."); JX 68 (email from Mulligan to Hach representative dated June 12, 2014) ("I am the new sales engineer . . . . I will be taking over Lars' responsibilities and would like to take this

23

with Silicon Valley Optics Technology, Inc. ("SVOTek"), a manufacturer of optical components for which Mulligan also worked as a vendor.[79] In one email, Liu informed Hach that the merger with SVOTek would be beneficial to Hach because Base Optics did not have manufacturing facilities and SVOTek did, although Base Optics did in fact have a manufacturing facility in Stroudsburg, Pennsylvania.[80] In another email, reminiscent of Liu's email to Hach on May 9, Mulligan represented to employees at SVOTek that Myrick and Sandstrom were

---

opportunity to introduce myself. I am familiar with your requirements (per this extended e-mail thread) and just need to know if Lars has quoted you yet. If not, please let me know and I will proceed. We have the coating capability here and would welcome your interest."); JX 97 (embedded email from Davison to Bharat dated June 17, 2014) ("My name is Joanna and I am now helping to manage Argus International sales to [Bharat]. The former contact Brian Morrissey and Lars Sandstrom have left the company.").

[79] *See, e.g.*, JX 68 (email from Mulligan to Hach representative dated June 12, 2014) ("Argus is expanding and merging with SVOTek which has 15 . . . state-of-the-art large coating chambers, and a complete line of precision optics fabrication production equipment."); JX 77 (email from Liu to Hach dated June 17, 2014) ("Greg Mulligan is our sale[s] engineer. He will serve you for all your optical needs. We are merging with SVOTek now which will be completed by the end of this week.").

[80] *See* JX 77 (email from Liu to Hach dated June 17, 2014) ("We are merging with SVOTek now which will be completed by the end of this week. SVOTek has been vender for Argus International for many years. Neither Argus nor Base [O]ptics has no manufacturing facilities, now we do."); Trial Tr. 42:2–10 (Myrick). Base Optics alleges that Liu was aware of Base Optics' Stroudsburg manufacturing facility when she represented otherwise to Hach, *see, e.g.*, Trial Tr. 42:2–12 (Myrick), and Liu testified that she invested in Base Optics specifically so that she could manufacture products in the United States. *See* Trial Tr. 307:4–24 (Liu) ("Q: At that time [in 2012] did you become a one-third owner of Base [Optics]? A: Yes, because [Myrick, Sandstrom, and I] talked many times on the phone, and they know that I want to produce something in this country. Q: Why did you . . . decide to invest in Base Optics? A: Because in my mind I have a dream to manufacture something here in the U.S. I don't want to just buy and sell. I wanted to be able to make something and with a brand name, and that way when I die, I think I will—think I create something.").

Argus contractors that had stolen Argus's customers from Liu, purportedly relaying information Liu had told him in a meeting the previous week.[81]

On June 20, 2014, in an effort to ease the transition of DBA Customers away from Base Optics, Liu created a new Delaware corporation named Argus Photonics, Inc. ("Argus Photonics"). Liu testified that she specifically chose the name "Argus Photonics" because she believed its similarity to "Argus International" would make retaking the DBA Customers easier.[82] Further evidencing that strategy, Liu sent a draft press release on June 24, 2014, captioned "A few words from the president of Argus Photonics, Inc.," to Davison, Mulligan, and another SVOTek representative, which release she planned to send to Argus's customers:

> I am Yaping, President of Argus International Ltd. Due to an on-going trademark dispute over Argus International and to ensure smooth operations we have decided to change our name to Argus Photonics. We will continue to serve our customers and care for our vendors with the same standard of excellence you have come to expect from Argus. There may be some confusion in the beginning, but we will try to complete this quick transition as smoothly as possible.

---

[81] *See* JX 76 (embedded email from Mulligan to individuals at SVOTek dated June 16, 2014) ("John and I met with Yaping Liu last week and we are going to be working with Argus International to help her get her customers back. She had some questionable people working for her that pretty much stole her customers."). Liu testified that she never told Mulligan that Base Optics stole her customers and that she was unaware Mulligan had made that representation to SVOTek. *See* Trial Tr. 408:3–409:18 (Liu).

[82] Trial Tr. 411:4–10 (Liu) ("Q: And you chose the name Argus Photonics specifically to be similar to Argus International so you could take its customers. A: Yeah, I can take customers back, that's right. I can work with the customers, so I don't want customer think it's completely brand new; it is continue Argus International.").

25

I would like to take this opportunity to announce some great news! We are teaming up with Silicon Valley Optics, operating out of a 26,000 sq ft facility in Fremont, CA complete with optical manufacturing capability. Argus Photonics will now be able to provide excellent thin-film applications and we look forward to assisting you with OEM mass production needs as well as prototype research projects.[83]

Neither the launch of Argus Photonics, nor Argus's merger with SVOTek, nor Liu's desire to fulfill the Government Bid ever had the opportunity to materialize, however;[84] after some initial confusion as to why they had lost access to the Argus Email Accounts, Myrick and Sandstrom discovered that Liu had hijacked the accounts and was contacting certain DBA Customers, and they moved quickly to stop her. On June 13, 2014, Base Optics delivered to Liu a cease and desist letter demanding that she terminate all contact with the DBA Customers, return Base Optics' access to the Email Accounts, and return to Base Optics any payments she retained from DBA Customers.[85] When Liu did not comply with

---

[83] JX 86; *see also* Trial Tr. 365:7–366:5 (Liu) ("Q: Did you ever send this email [in JX 86] to anybody other than the three recipients on this email? A: No. Q: Why did you not send this email to anybody else? A: That time I had a lawyer, and I talked to lawyer about this, and the lawyer said that it's okay to send it to the customers, but wait until Friday because Friday the lawyer told me he has a court date about this case. So he said to wait until Friday, and after Friday, you can send. And then so I wait until Friday. Q: Did Argus Photonics—you said on Friday. Was that the day that the temporary restraining order was entered in this case? A: Yes.").

[84] *See* Trial Tr. 365:7–366:22 (Liu) (testifying that she did not send the press release announcing Argus Photonics to customers due to a temporary restraining order issued in this litigation, and that Argus Photonics has never conducted or solicited any sales); *id.* at 402:16–21 (Liu) ("Q: And then you say in this email [in JX 77], 'We are merging with SVOTek now,' but that wasn't true, was it? You weren't merging with SVOTek. A: We were. Yes. We are talking about we are going to finish that week, and then since the case going on, so everything stopped.").

[85] *See* JX 72.

that letter, Base Optics initiated this action on June 20, 2014, seeking to enjoin the Defendants from further violating the Amended Agreement and interfering with Base DBA Argus, and seeking damages for the harm the Defendants had allegedly already caused Base Optics.

On June 24, 2014, Liu provided Base Optics with passwords to regain access to the Argus Email Accounts. Upon logging into his Argus email account for the first time since losing access, however, Sandstrom found that all of the emails in the account had been deleted, save a few.[86] Liu acknowledges deleting at least one email from Sandstrom's Argus email account, but denies deleting any of the other messages.[87] Although Base Optics was able to recover via a backup file most of the emails Sandstrom sent and received from his Argus email account prior to June 4, 2014, Base Optics was unable to recover the emails that Liu (or anyone else) sent or received from Sandstrom's Argus email account during the roughly three-week period that Liu had access to the account.[88]

*F. Procedural History*

On June 20, 2014, Base Optics filed its Complaint and a Motion for a Temporary Restraining Order against Liu and Argus. On June 27, 2014, I entered an order temporarily restraining the Defendants from further blocking Base Optics'

---

[86] Trial Tr. 127:11–18 (Sandstrom).
[87] *Id.* at 356:9–23 (Liu).
[88] *Id.* at 127:19–128:5 (Sandstrom).

access to the Argus Email Accounts, from having any contact with the DBA Customers, and from retaining any DBA Customer payments (the "TRO"). On July 25, 2014, I found the Defendants in contempt of the TRO after Base Optics submitted evidence that Argus, via its agent Davison, solicited business from Bharat after the TRO became effective.

On June 28, 2014, Base Optics moved to preliminarily enjoin the Defendants from engaging in the conduct addressed in the Temporary Restraining Order, as well as from communicating with Base Optics' vendors about Base Optics, from disparaging Base Optics to any third party, and from allowing Argus to fall out of good standing with the States of Washington or Delaware for the pendency of the litigation. Before the Motion for a Preliminary Injunction could be heard, on August 11, 2014, the parties entered into a standstill agreement accepting the terms proposed in the Motion by Base Optics.

On August 20, 2014, the Defendants filed their Verified Counterclaims against Base Optics, asserting a single count for breach of contract.

On October 21, 2014, Base Optics moved for the second time for contempt and sanctions against the Defendants (the "Second Motion for Contempt and Sanctions"), alleging that the Defendants had failed to timely produce responsive documents in violation of a previous court order compelling production, causing Base Optics prejudice, and further alleging that the overdue documents eventually

28

produced by the Defendants showed that: (1) Liu knew about Davison's contact with Bharat in violation of the TRO, despite her counsel's representations to the Court at the time; (2) Liu had in fact ordered Davison to contact Bharat using an Argus Photonics email address—ownership of which company the Defendants had previously not disclosed to Base Optics in discovery—in order to skirt the TRO; and (3) Argus had committed additional violations of the TRO by forwarding a DBA Customer's information to a third party. That Motion requested that the Court shift Base Optics attorney's fees and expenses. I heard oral argument on the Second Motion for Contempt and Sanctions on November 3, 2014, following which I reserved judgment on the Motion until after trial.

A two-day trial was held on December 15–16, 2014, following which the parties submitted written closing arguments.

## II. ANALYSIS

Base Optics' Complaint asserts nine counts against Liu, individually and on behalf of Argus: Count I for computer related offenses pursuant to 11 *Del. C.* §§ 931–941; Count II for misappropriation of trade secrets pursuant to the Delaware Uniform Trade Secrets Act, 6 *Del. C.* §§ 2001–2009; Count III for breach of contract; Count IV for tortious interference with business relationships; Count V for tortious interference with contractual relationships; Count VI for conversion; Count VII for unjust enrichment; Count VIII for breach of fiduciary duties; and

29

Count IX for defamation.[89] As relief, the Complaint seeks (1) a declaration that the Defendants violated Base Optics' rights under Delaware law and the Amended Agreement, and that the portfolio of DBA Customers are the "rightful property of Base Optics;" (2) an order requiring the Defendants to return Base Optics' property, including its data, such as documents and emails; (3) specific performance of the Amended Agreement; (4) an accounting of funds the Defendants received from DBA Customers during the period of the Amended Agreement; (5) monetary damages totaling $1,070,002.00; (6) fee shifting; and (7) for the Court to pierce the corporate veil "as to Argus and Liu's entities which she has used to perpetrate the wrongdoings."[90]

The Defendants asserts a single counterclaim against Base Optics for breach of contract, seeking unspecified monetary damages and their reasonable attorney's fees.[91]

### A. Base Optics' Claims

Despite the litany of legal theories asserted by Base Optics, this case principally involves a contractual dispute. Thus, I begin my analysis with Base Optics' breach of contract claim. Because, for reasons set forth below, I rule in favor of Base Optics on its breach of contract claim, I will consider the other

---

[89] Compl. ¶¶ 60–133.
[90] Pl. Base Optics Inc.'s Post-Tr. Opening Br. at 40; Compl. at 31–33.
[91] Counterclaim at 13–14; *see also* Defs.' Opening Post-Tr. Br. at 31–32.

counts of the Complaint only to the extent they would entitle Base Optics to relief beyond that which would stem from the Defendants' breach of contract.

## 1. Breach of Contract

In order to prevail on its breach of contract claim, Base Optics must demonstrate by a preponderance of the evidence[92]: (1) the existence of the contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff.[93]

In determining whether these elements have been met, the issues before me are largely legal, not factual, ones. Base Optics argues that Argus granted Base Optics the exclusive right to transact business with the DBA Customers in the Amended Agreement,[94] and that the Defendants thus breached the Amended Agreement to the detriment of Base Optics when Liu, Davison, and Mulligan later began "contacting and servicing, or offering to service," certain DBA Customers

---

[92] *See, e.g.*, *Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 586783, at *4 (Del. Ch. Aug. 20, 2009) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard. Under that standard, for example, a claimant asserting a breach of contract must prove the elements of its claim by a preponderance of the evidence."). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *In re El Paso Pipeline Partners L.P. Derivative Litig.*, 2015 WL 1815846, at *15 (Del. Ch. Apr. 20, 2015) (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)).

[93] *E.g.*, *In re El Paso Pipeline Partners L.P.*, 2015 WL 1815846, at *25 (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[94] By "exclusive right" I mean a right that is exclusive between the contracting parties.

on behalf of Argus.[95]  The Defendants do not dispute their actions in transacting business with the DBA Customers following the execution of the Amended Agreement; rather, they assert that these actions do not constitute breaches of contract, arguing that the Amended Agreement is unenforceable due to a mutual mistake of fact, and that, in any event, Base Optics did not possess an exclusive right to transact business with the DBA Customers under the Amended Agreement. For the reasons set forth below, I reject the Defendants' arguments and find in favor of Base Optics on its breach of contract claim.

### a. Existence of the Contract

### i. Mutual Mistake of Fact

The Defendants argue that they cannot be held liable for a breach of the Amended Agreement because that agreement was void *ab initio* due to the parties' mutual mistake as to the consideration Base Optics offered Argus to secure the amendment. At the time the parties executed the Amended Agreement, Base Optics calculated that Argus owed it approximately $18,000 in back payments under the terms of the Original Agreement, but since the initiation of this litigation

---

[95] Pl.'s Pre-Tr. Opening Br. at 44.  In briefing, Base Optics also argued in a cursory fashion that the Defendants committed other, more minor breaches of the Amended Agreement, such as failing to pursue legal action against former Argus employee Morrisey, but Base Optics did not present evidence as to the harm it suffered due to these auxiliary breaches.  In any event, because I find below that Argus breached the Amended Agreement by soliciting and transacting business with certain DBA Customers, and because this breach encompasses the entirety of the relief sought by Base Optics, I do not find it necessary to address in detail any additional grounds for violations of the Amended Agreement.

Base Optics has reduced its calculation of back payments owed at the time the Amended Agreement was entered to approximately $14,000.[96] According to the Defendants, "[B]ecause the alleged $18,000 [royalty] overpayment was the consideration given for the Amended Agreement, and because the [royalty] overpayment calculation was materially incorrect, the Amended Agreement is void due to the parties' mutual mistake."[97] For support, the Defendants point to language in the Amended Agreement providing that Argus will "transfer its customer-base to Base Optics from this point going forward Base Optics owns the customer-base except Synergy International LTD," and that "[t]his transfer has been paid for from royalties already paid in the [Original Agreement]."[98]

Under Delaware law, a contract is voidable on the grounds of mutual mistake of fact existing at the time of contract formation.[99] A litigant asserting mutual mistake of fact as an affirmative defense must prove by clear and convincing evidence[100] that: "(1) both parties were mistaken as to a basic assumption, (2) the mistake materially affects the agreed-upon exchange of

[96] *E.g.*, Trial Tr. 207:5–208:4 (Sandstrom).
[97] Defs.' Opening Post-Tr. Br. at 32.
[98] JX 22 § 2(b)(a).
[99] *E.g.*, *Hicks v. Sparks*, 89 A.3d 476, ¶ 10 (Del. 2014) (Table).
[100] *See Walsh v. Bailey*, 197 A.2d 331, 333 (Del. 1964) ("A Court of Equity may, of course, grant appropriate relief when mutual mistake is properly proven, but to prove it the evidence must by clear and convincing; mere preponderance does not suffice."); *Fed. Land Bank of Balt. v. Pusey*, 1986 WL 9041, at *4 (Del. Super. July 21, 1986) ("Generally, in civil cases the demandant's proposition can be established by a 'preponderance of the evidence,' but for the defense of mutual mistake the stricter standard of clear and convincing proof is applied to measure the necessary persuasion." (citing 9 Wigmore, *On Evidence* § 2498)).

performances, and (3) the party adversely affected did not assume the risk of the mistake."[101]

Here, the Defendants have failed to show that the Amended Agreement is unenforceable due to a mutual mistake of fact; rather, the record reflects clearly the opposite.[102] First and foremost, it cannot be said that the Defendants were mistaken as to a basic assumption underlying the exchange: Liu expressly testified that, at the time she negotiated the Amended Agreement, *she did not believe* that the $18,000 figure Myrick quoted was an accurate calculation of the amount Argus owed Base Optics in back payments. Further, even assuming *arguendo* that the Defendants were under the mistaken impression that Base Optics was foregoing a rightful claim against Argus for $18,000, this mistaken belief would not materially alter the agreed-upon exchange supporting the Amended Agreement. The primary purpose of the Amended Agreement was not the forgiveness of this debt,[103] but

---

[101] *Hicks*, 89 A.3d ¶ 10.

[102] As a preliminary matter, I note that the Amended Agreement does not expressly state that Base Optics would forgive Argus's back payments. The contract language relied on by the Defendants to illustrate that Base Optics promised to forgive Argus's debt as partial consideration for the Amended Agreement—"This transfer [of the DBA Customers to Base Optics] has been paid for from royalties already paid in the [Original Agreement]"—is nonsensical, considering it was Base Optics, not Argus, that was obligated to pay royalties under the Original Agreement; even if "royalties" here refers to the DBA Customer payments (or the split of profits therefrom) that Argus was obligated to remit to Base Optics under the Original Agreement, the language does not refer to royalties still owed, but rather "royalties already paid." Regardless, Base Optics concedes that it agreed to forgive Argus's back payments in the Amended Agreement, *see* Pl.'s Pre-Tr. Br. at 13, and I will assume, for the sake of the Defendants' argument, that the above-quoted language refers to that particular agreement.

[103] *See, e.g., Fed. Land Bank of Balt.*, 1986 WL 9041, at *3 ("In order to constitute a relievable mistake of fact, such mistake must be as to a fact which enters into, and forms the very basis of,

34

rather it was so that Argus could escape the administrative burden of the royalties scheme, which Liu found confusing and troublesome, and regain the right to conduct business with and retain all profits from one of the largest DBA Customers, Synergy; indeed, these are the reasons why Liu approached Base Optics about amending the Original Agreement, *before* Myrick ever informed her that he believed Argus owed Base Optics money.[104] The Amended Agreement was also supported by additional, valuable consideration flowing to Argus, including that Base Optics promised to (and subsequently did) pay the approximately $1350 monthly rent for Argus's Scotts Valley office up to May 2014 and pay off Argus's Bank of America outstanding credit line, approximately $17,000.[105] These additional bargained-for concessions provide further support that forgiveness of Argus's back payments was not material to the parties' agreed-upon exchange of performances in the amendment.

For these reasons, I find that the Amended Agreement is not a product of a mutual mistake of fact, but instead is a valid and enforceable contract.

### ii. Effect of the Contract Language

---

the contract; it must be of the essence of the agreement, the *sine quo non* or, as it is sometimes expressed, the efficient cause of the agreement.").

[104] *See supra* notes 14–15 and accompanying text; JX 22 § 1 ("The purpose of this amendment is to alter the division of customers in the [Original Agreement] to allow for simpler bookkeeping and the development [of] clear delineation between customers that Base Optics services and the Argus International Ltd continues to serve. This change is at the request of Yaping Liu . . . with the intent of freeing Argus to service top customer Synergy International Optronics . . . .").

[105] JX 22 § 2(a)(c)–(d); Trial Tr. 26:18 – 27:19 (Myrick).

Next, the Defendants argue that, even if the Amended Agreement is enforceable, their actions in servicing the DBA Customers do not constitute breaches of contract because under the Amended Agreement both Base Optics and Argus "have non-exclusive rights to the [DBA Customers] and . . . [Argus] is free to engage in business with any customer [in] its customer base."[106] Base Optics, on the other hand, argues that the parties always understood that under the Amended Agreement Base Optics had the exclusive right to transact business with the DBA Customers, except Synergy.[107]

In resolving disputes over contract language, the Court must give effect to the parties' intentions and is to attempt to determine those intentions first by looking to the four corners of the contract.[108] Where the contract is clear and unambiguous, the Court "will give effect to the plain-meaning of the contract's terms and provisions."[109] Language is clear and unambiguous when it is not susceptible to more than one reasonable interpretation.[110] Of course, the fact that the parties disagree about the meaning of contract language does not alone demonstrate that the language is ambiguous.[111]

---

[106] Defs.' Opening Post-Tr. Br. at 35.
[107] *E.g.*, Pl. Base Optics Inc.'s Post-Tr. Opening Br. at 12.
[108] *E.g.*, *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).
[109] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).
[110] *E.g.*, *id.* at 1160.
[111] *E.g.*, *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.8 (Del. 1997).

Rather than addressing the effect of any specific contract language in the Amended Agreement, the Defendants instead focus on certain language that does not appear in the contract, arguing that the Amended Agreement does not include, in either the provisions of the amendment itself or in the surviving portions of the Original Agreement, "an exclusivity provision or non-compete despite the fact that Mr. Myrick, the drafter of the document, was subject to non-compete agreements and knew how they operated."[112] According to the Defendants, the lack of such explicit language is consistent with the parties' intent that the Original Agreement, ostensibly carried over into the Amended Agreement, "was not a sale of Argus's most valuable asset—its customer list—but rather was a services and management agreement wherein Base [Optics] agreed to service Argus's customers."[113]

The Defendants' argument, however, does not surmount the plain meaning of the language that actually does appear in the Amended Agreement. The Amended Agreement provides, in relevant part, that Argus shall "transfer its customer-base to Base Optics from this point going forward Base Optics owns the customer-base except Synergy International Optronics which will continue to be maintained by Argus International LTD,"[114] and further that Argus shall "transfer all open sales orders and new orders in Argus Quick Books to Base Optics except

[112] Defs.' Opening Post-Tr. Br. at 35.
[113] Id. at 35–36.
[114] JX 12 § 2(b) (the Original Agreement); JX 22 § 2(b)(a) (the Amended Agreement).

Synergy International Optronics which will continue to be maintained by Argus International LTD."[115] Argus's agreement to "transfer its customer-base" and "open sales orders and new orders" to Base Optics, and its acknowledgement that Base Optics now "owns the customer-base," are rendered meaningless unless Base Optics was receiving from Argus the exclusive right to transact business with the DBA Customers.[116] My conclusion in this regard is reinforced by the fact that the parties included an exception to these provisions, expressly reserving for Argus the right to transact business with Synergy; if, as the Defendants contend, Argus and Base Optics both had non-exclusive rights to transact business with all of the DBA Customers, which would include Synergy, then this exception would be unnecessary and rendered meaningless.[117] For these reasons, I find that the terms of the Amended Agreement, albeit unskillfully drafted, can only be reasonably interpreted to mean that the Amended Agreement granted Base Optics the

---

[115] JX 12 § 2(c) (the Original Agreement); JX 22 § 2(b)(b) (the Amended Agreement).

[116] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term meaningless or illusory." (internal quotation marks omitted)). For example, when asked about the effect of this exact language in the context of the Original Agreement, Liu testified that she believed the separate requirements that Argus "transfer its customer-base" and that Argus "transfer all open sales orders and new orders in Argus Quick Books" *both* meant that Argus only needed to provide Base Optics with access to Argus's QuickBooks account to help manage Argus. *See* Trial Tr. 314:17–316:15 (Liu). This interpretation is nonsensical; it renders these provisions duplicative and does not at all explain the language providing that "Base Optics owns the customer-base."

[117] Although not necessary to my analysis, I note that Liu's testimony at trial suggests that she understood that the Amended Agreement operated as a transfer of the exclusive right to service the DBA Customers to Base Optics, as does her communications with Myrick leading up to the execution of the Amended Agreement. *See* Trial Tr. 404:11–407:11 (Liu); *supra* note 15 and accompanying text.

38

exclusive right to transact business with the DBA Customers, with the sole exception of Synergy, with which customer the Amended Agreement granted Argus the exclusive right to transact business.

### b. Breaches of the Amended Agreement

Having determined that the Amended Agreement is valid, and that under that agreement Argus granted Base Optics the exclusive right to transact business with all of the DBA Customers except Synergy, it is clear that the Defendants breached the Amended Agreement on numerous occasions. Base Optics has proven by a preponderance of the evidence that Liu, Davison, and Mulligan, on behalf of Argus, contacted certain DBA Customers, solicited their business, and successfully booked a number of orders for parts with them; Liu unabashedly admits to these facts in her own testimony.

### c. Damages for Breaches of the Amended Agreement

In order to satisfy the third and final element of a breach of contract claim—damages—the "plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract."[118] The standard remedy for breach of contract is expectation damages: based on the reasonable expectations of the parties *ex ante*, "the amount

---

[118] *In re El Paso Pipeline Partners L.P. Derivative Litig.*, 2015 WL 1815846, at *25 (Del. Ch. Apr. 20, 2015) (quoting *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013)).

of money that would put the promisee in the same position as if the promisor had performed the contract."[119] "While courts will not award damages which require speculation as to the value of unknown future transactions, so long as the court has a basis for a responsible estimate of damages, and plaintiff has suffered some harm, mathematical certainty is not required."[120]

Base Optics argues that among the damages it suffered due to the Defendants' breach of the Amended Agreement were the profits it would have enjoyed under that contract, but which were lost due to the Defendants' breach and pursuit of certain DBA Customers. The Defendants have argued in post-trial briefing generally that Base Optics' contract damages are not proved; however, the Defendants have not argued, and indeed no party has engaged upon the issue of, whether lost profits under Base Optics' damages theory above are direct and recoverable expectation damages or mere consequential damages.[121] Because the

---

[119] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 17 (Del. Ch. 2003) (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001)).

[120] *In re El Paso Pipeline Partners L.P.*, 2015 WL 1815846, at *25 (quoting *Thorpe v. CERBCO, Inc.*, 1993 WL 443406 (Del. Ch. Oct. 29, 1993)).

[121] *See, e.g., Crowell Corp. v. Himont USA, Inc.*, 1994 WL 762663, at *3 (Del. Super. Dec. 8, 1994) ("Under Delaware law, consequential damages in the form of good will, lost future profits, and lost customers are not awarded in breach of contract claims. The Delaware courts have consistently found these damages to be speculative in nature, and; therefore, have barred recovery for them.").

Defendants have waived this issue by failing to raise it, I will analyze lost profits under Base Optics' theory described above as direct and recoverable damages.[122]

Base Optics has proven by a preponderance of the evidence that the Defendants booked three orders for parts with DBA Customers while the Amended Agreement was in effect, in violation of Base Optics' exclusive right to service those customers under that agreement: an order with Sirchie totaling $2,353.44 on April 23, 2014; an order with Rocky Mountain totaling $5,145 on April 25, 2014; and an order with Rocky Mountain totaling $2,205 on June 23, 2014. Base Optics is entitled to damages in the amount of the profit it would have reasonably expected to receive from these orders.[123] Base Optics did not provide evidence as

---

[122] Although not necessary to my analysis for the reasons stated, I note that this Court has found that, in the context of a breach of a non-compete agreement, lost profits from business within the scope of the parties' non-compete are direct, not consequential damages. *See eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013) ("Black's Law Dictionary defines consequential damages as 'losses that do not flow directly and immediately from an injurious act but that result indirectly from the act.' As to when lost profits are considered consequential damages, I accept the Second Circuit's cogent explanation in *Tractebel Energy Marketing v. AEP Power Marketing* [487 F.3d 89 (2d Cir. 2007)]. There, the court held that lost profits are considered consequential damages when, 'as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements.' By contrast, lost profits are not considered consequential damages when 'profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed.' With respect to a non-compete provision or agreement, I conclude that the profits of the product line or business that is being protected from competition constitute the benefit for which the protected party bargained. Furthermore, lost profits on the part of the non-breaching party are the direct and natural consequence of breaching a non-compete provision. . . . Because lost profits are the type of damages most likely to result from a breach of a non-compete provision, I consider lost profits to be in the nature of direct damages in this case.") (citations omitted)).

[123] Base Optics is not entitled, as it argues, to the entire amount of these orders, because the cost of the parts was covered by Argus. *See, e.g.*, *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146

to its profit margin on the specific parts in these orders. However, Sandstrom testified that Base Optics' average cost of goods for its parts is approximately 70 to 80%, which figure the Defendants acknowledged at trial to be true.[124] Thus, I find that utilizing a 30% profit margin provides a reasonable estimate of Base Optics' lost profit on the three orders the Defendants booked with DBA Customers while the Amended Agreement was in place. Base Optics is entitled to $2,911.03 in damages.

I note that Sandstrom, who was not qualified as an expert, attempted to quantify generally a damages number for Base Optics arising from all of the Defendants' wrongdoing, including breach of contract.[125] As I understand the testimony, Sandstrom attempted a cryptic "regression analysis," comparing sales figures for Argus's DBA Customer orders in the two years before the Defendants' contractual and statutory transgressions with sales figures for Base DBA Argus's DBA Customer orders following those transgressions, using his discretion to adjust certain figures to account for "noise" or Base DBA Argus's anticipated increase in business, in an attempt to justify as expectancy damages lost profits in the amount

---

(Del. 2009) ("Contract damages are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall." (internal quotation marks omitted)).
[124] Trial Tr. 200:3–14 (Sandstrom).
[125] See id. at 140:7–145:9 (Sandstrom); Pl. Base Optics Inc.'s Post-Tr. Opening Br. at 40–41.

of $310,557.28.[126] That strikes me as a rather astounding figure, in light of the fact that, according to Base Optics' own accounting, in the six-month period that Base Optics did business as Argus in 2013—the year before the breach—Base DBA Argus' total profit was *twenty-five dollars*.[127] To the extent that Sandstrom was qualified to offer this evidence, the calculations that led to his damages figure were either not presented or incomprehensible, and the analysis he proposed is too speculative to support a further award of damages.[128]

## 2. Computer Related Offenses

In addition to its contract claim, Base Optics contends that it possesses a statutory tort claim against the Defendants pursuant to 11 *Del C.* §§ 931–941, which criminalize certain misconduct relating to computers and create a private cause of action for individuals aggrieved by that misconduct. Section 941 provides, in relevant part, that "any person who suffers any injury to person, business or property may bring an action for damages against a person who is

---

[126] *See, e.g.* Trial Tr. 160:20–166:8 (Sandstrom); Pl. Base Optics Inc.'s Post-Tr. Opening Br. at 41.

[127] *See* JX 127 at B000924; Trial Tr. 197:23–198:23 (Sandstrom) (explaining JX 127 as an accounting of Base DBA Argus's profits in 2013 that Sandstrom prepared at the request of H.C. Tang, Base Optics' fourth stockholder); JX 34 (email from Myrick to Liu dated Mar. 7, 2014) ("Base Optics only had $25 (not $25K) in profit from Argus."). *But see id.* ("Basically, all work Lars and I did for Argus in 2013 was an investment in for future revenue to come from salvaged customers."); Trial Tr. 203:1–9 (Sandstrom) ("It cost me money to build up the reputation of Argus because it was a badly damaged company, so there were costs that we faced up front and now we harvest later on. That's how business works.").

[128] Although I am sympathetic to Base Optics' position that it expected Base DBA Argus to vastly grow its profits after moving past the initial investment stage in the DBA arrangement, Base Optics has not adequately demonstrated that its expectation was anything more than the optimistic speculation that accompanies most budding ventures.

alleged to have violated any provision of §§ 932–938 of this title,"[129] regardless of whether the State has filed criminal charges against that person for the alleged computer crime.[130]  Sections 932–938 set forth the various computer crimes, including, relevant here, "unauthorized access to a computer system" (Section 932), "theft of computer services" (Section 933), "interruption of computer services" (Section 934), and "misuse of computer system information" (Section 935).

> ### a. The Defendants Engaged in Interruption of Computer Services

Generally, the parties do not dispute the facts surrounding the disruption of Base Optics' access to the Argus Email Accounts:  Liu explicitly admits that (1) she intentionally caused the passwords to the Argus Email Accounts—which were being used by Base DBA Argus—to be reset by contacting the company hosting Argus's website and email accounts, thus cutting off the Base Optics' access to the Argus Email Accounts, (2) she then intentionally signed into the Argus Email Accounts accounts and read through numerous emails contained therein, and (3) she then intentionally used her control of the Argus Email Accounts to forward

---

[129] 11 *Del. C.* § 941(c).  Subsection (c) provides that an aggrieved person's action for damages may be brought "[i]ndependent of or in conjunction with an action under subsection (a) of this section," which subsection provides an aggrieved person with an additional private cause of action to seek injunctive relief, restitution, or the appointment of a receiver if the aggrieved person "has reason to believe that any other person has been engaged, is engaged or is about to engage in an alleged violation of any provision of §§ 932–938 of this title." *Id.* § 941(a), (c).

[130] *See id.* § 941(f) ("The filing of a criminal action against a person is not a prerequisite to the bringing of a civil action under this section against such person.").

several of these emails, including the email attachments, to herself, Davison, and Mulligan. Those facts are undisputed. The parties do dispute whether these actions by the Defendants[131] constitute computer crimes pursuant to Title 11, specifically Sections 932–935. That issue turns in part on whether the defined terms used in those statutes encompass the situation here, involving email accounts, and in part on whether the Defendants' actions were "authorized." Base Optics argues that the Defendants' actions with regard to the Argus Email Accounts violate each of Sections 932–935, but it provides nothing in the form of statutory analysis to support its arguments outside of conclusory statements.[132] The Defendants, on the other hand, argue that "accessing, interrupting or misusing" an individual's email account does not fall within the scope of any of these crimes. As support, the Defendants rely solely on the fact that Sections 932– 935 all "refer to interference with or disruption to a 'computer system,'" and

---

[131] The Defendants concede that Liu acted as a representative of Argus in connection with hijacking the Argus Email Accounts. *See, e.g.,* Defs.' Opening Pre-Tr. Br. at 1 ("Defendant Yaping Liu (together with Argus, 'Defendants') acknowledges that *Defendants* caused the e-mail disruption by changing Base[ Optics'] passwords to its Argus e-mail accounts. But *Defendants* acted out of desperation, not malice, after months of feeling taken advantage of by Base [Optics], paying tens of thousands of dollars to Base [Optics], and receiving nothing from Ms. Liu's substantial investment in Base [Optics]." (emphasis added)). Section 941 contemplates that business entities may both bring actions to remedy violations of the computer crimes statutes and be subjected to liability for violations of the computer crime statutes. *See* 11 *Del. C.* § 941(c) ("[A]ny *person* who suffers any injury to person, business or property may bring an action for damages against a *person* who is alleged to have violated any provision of §§ 932–938 of this title." (emphasis added)); *id.* § 931(13) (defining "person" to include a "corporation, trust, partnership, incorporated or unincorporated association and any other legal or governmental entity").

[132] *See, e.g.,* Pl.'s Pre-Tr. Opening Br. at 35–39.

Section 931 expressly provides a definition for email "separately and differently than a 'computer system.'" [133] In the Defendants' view, "[t]he fact that e-mail is intentionally omitted from [Sections 932–935] demonstrates the [General Assembly's] legislative intent that conduct related to e-mail is not within the purview of those statutes."[134]

Upon review of the computer crimes statutes, and the very limited case law interpreting them, I find that the Defendants' access, interruption, and misuse—to use the Defendants' words—of the Argus Email Accounts constitute, at the least, interruption of computer services pursuant to Section 934.[135] Under Section 934,

> A person is guilty of the computer crime of interruption of computer services when that person, without authorization, intentionally or recklessly disrupts or degrades or causes the disruption or degradation of computer services or denies or causes the denial of computer services to an authorized user of a computer system.[136]

As used in the computer crimes statutes, a "computer" is defined as a "programmable, electronic device capable of accepting and processing data."[137] A "computer system" means "a computer, its software, related equipment and

---

[133] Defs.' Opening Post-Tr. Br. at 21–22.
[134] *Id.* at 22.
[135] To the extent that the facts would support finding the Defendants also in violation of other computer crimes, damages in this instance would be coextensive with and cumulative of the damages under Section 934. Therefore, I do not consider the other computer crimes raised by Base Optics, and nothing in this Memorandum Opinion should be construed as a determination of liability as to these other computer crimes.
[136] 11 *Del. C.* § 934.
[137] *Id.* § 931(3).

communications facilities, if any, and includes computer networks."[138]   A "computer network" means a "set of related devices connected to a computer by communications facilities," a "complex of 2 or more computers, including related devices, connected by communications facilities," or the "communications transmission facilities and devices used to interconnect computational equipment, along with control mechanisms associated thereto."[139]   "'Computer services' includes, but is not limited to, computer access, data processing and data storage."[140]   "Data" means "information of any kind in any form, including computer software."[141]   "Computer software" means "1 or more computer programs, existing in any form, or any associated operational procedures, manuals or other documentation."[142]   A "computer program" means "a set of instructions, statements or related data that, in actual or modified form, is capable of causing a computer or computer system to perform specified functions."[143]   And "access"— here used, infelicitously, as a verb—means "to instruct, communicate with, store data in or retrieve data from a computer, computer system, or computer network."[144]

---

[138] *Id.* § 931(8).
[139] *Id.* § 931(4).
[140] *Id.* § 931(6).
[141] *Id.* § 931(9).
[142] *Id.* § 931(7).
[143] *Id.* § 931(5).
[144] *Id.* § 931(1).

The Argus Email Accounts consist of data, both in terms of the information comprising the messages stored in those accounts and of the computer software that causes the email system to operate. That data is stored on computer systems—email servers owned and operated by third parties, which email servers the users of the Argus Email Accounts must "access" in order to utilize the accounts. This process of using the Argus Email Accounts—of communicating with, retrieving data from, storing data on, and instructing data to be sent from, the email servers—is a computer service. Therefore, Liu's actions to block the Base Optics employees—indisputably, authorized users—from accessing the Argus Email Accounts by changing the accounts' passwords constitutes both disrupting computer services and causing the denial of computer services as contemplated by Section 934.

Whether the Defendants are liable under Section 934 for this disruption and denial of computer services to Base Optics, though, is dependent on whether Liu was authorized to take such action.[145] Under the computer crimes statutes, the determination of whether the defendant possessed authority to engage in the

---

[145] Section 934 also requires that Liu acted recklessly or with intent, and further that the Base Optics employees be authorized users of the computer system providing the computer services. The record reflects, and the parties do not dispute, that Myrick, Sandstrom, and Perry were authorized to use the Argus Email Accounts, and that Liu intentionally changed the passwords to block Base Optics from using the accounts.

conduct at issue is a fact-specific inquiry.[146] Here, while Liu was *able* to block access to these accounts by using her position as the administrator of Argus's website and email accounts to change the accounts' passwords, that position alone is not determinative.[147] I note that in order for Base Optics to successfully operate as Base DBA Argus with the customers transferred to it in the Amended Agreement, it was imperative that Base Optics be able to service those customers representing itself as Argus, including by using the Argus E-mail Accounts. Liu bestowed Base Optics with the Argus Email Accounts in furtherance of the parties' contractual DBA arrangement under the Amended Agreement, which specifically dictated that Argus allow Base Optics to use its name and granted Base Optics the exclusive right to service nearly the entirety of Argus's customer base. Liu

---

[146] *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *18 (Del. Ch. Mar. 5, 2014) (holding the defendant, a technician at a fire alarm and fire protection system vendor, liable under Section 935(4) for using the plaintiff's program files concerning the fire system at a third-party hospital, which files the defendant had received from one of the plaintiff's technicians, despite Smith's argument that "technicians from different fire system vendors exchange program files freely and regularly," finding that "whether any such exchange can be considered 'authorized' depends on the circumstances," and that it was more likely than not that the defendant had no reasonable basis to believe that the plaintiff or the third-party hospital had authorized the plaintiff's technician to send the defendant the program files); *State v. Boyd*, 2008 WL 726900, at *4–6 (Del. Com. Pl. Mar. 3, 2008) (denying the defendant's motion to dismiss a criminal charge under Section 935 arising from the defendant, a police officer, using the State's judicial information database to locate and contact a member of a jury that had recently returned a civil verdict against the defendant, despite the defendant's argument that police officers are authorized users of that database by statute, because whether the defendant's specific use was authorized is an issue of fact for a jury to determine based on the statute's "exhaustive list of what are considered authorized and permissible uses" of the State's database).

[147] *Cf. Boyd*, 2008 WL 726900, at *5 ("By its wording Section 305(b)(1) grants law enforcement officers, such as the defendant, broad discretion in their usage of the [State's judicial information database]. However, the Court must note . . . that it should not be inferred that those with authority to access [that database] are permitted to abuse it.").

49

expressly acknowledged in the Amended Agreement that she knew Base Optics relied on the Argus Email Accounts to do so. Finally, though Liu was the named administrator with Argus's email provider, as well as was the president, CEO, and sole owner of Argus, the Argus Email Accounts were actually paid for and maintained by Base Optics. Although I don't find any of these factors individually determinative on the issue, together they demonstrate by a preponderance of the evidence that Liu was not authorized to block Base Optics' access to the Argus Email Accounts.[148] Therefore, I find that the Defendants violated Section 934.

### b. Damages for Violation of Section 934

Section 941(c) provides that, in an action for damages under the computer crimes statutes, "the aggrieved person shall recover actual damages and damages for unjust enrichment not taken into account in computing damages for actual loss."[149] In addition, the plaintiff may recover treble damages "where there has been a showing of willful and malicious conduct."[150]

Base Optics has proven by a preponderance of the evidence that, but for Liu disrupting Base Optics' access to the Argus Email Accounts, the DLA would have accepted the Government Bid and awarded Base DBA Argus the government

---

[148] Liu's belief that she was authorized to block Base Optics' access to the Argus Email Accounts due to her control of Argus, even if it was reasonably held, is not relevant to my analysis. Interruption of computer services, unlike certain other computer crimes, does not require that the defendant know that her actions are unauthorized. *Compare* 11 *Del. C.* § 934, *with* 11 *Del. C.* § 932, *and* 11 *Del. C.* § 935(3)–(4).

[149] *Id.* § 941(c).

[150] *Id.*

contract. The DLA specifically sought out Base DBA Argus, via Perry, to submit the Government Bid because the DLA could not find other vendors to supply the part it needed and because it knew Argus had successfully supplied the same part in the past. When the DLA required Base Optics to withdraw the Government Bid due to its inability to "perform as" Argus,[151] rather than turn to another vender, the DLA instead went through the process of approving Base Optics as a vendor and inviting it to re-submit a bid for the part. Even Liu thought Base DBA Argus was likely to secure the government contract based on her belief that the price quoted in the Government Bid was low. Because I find it more likely than not that the DLA would have awarded Base Optics the government contract from the Government Bid, Base Optics is entitled to the profits it reasonably could have expected to receive under the terms of the Government Bid.[152]

---

[151] The Defendants argue that, because Perry brought the issue with the Argus Email Accounts to the DLA's attention and "unilaterally withdrew [Base DBA Argus's] bid," Base Optics either itself caused its damages or failed to mitigate those damages. Defs.' Opening Post-Tr. Br. at 27. I do not find these arguments persuasive. The record reflects that Perry did not unilaterally withdraw the Government Bid; instead, counsel for the DLA advised Perry that the Bid had to be withdrawn when Perry presented the DLA with two options, either re-submitting a bid as Base Optics or moving forward with the Government Bid but using a non-Argus email account to communicate with the DLA. To the extent that I understand the Defendants' other argument it is that Base Optics could have avoided or mitigated its damages by hiding the email issue from the DLA. However, the facts demonstrate that Perry acted reasonably in bringing the email issue to the attention of the DLA.

[152] *Cf. Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *29 (Del. Ch. Mar. 5, 2014) ("I found that Wayman failed to prove that it would have been awarded the Doylestown contract but for Premium Fire's use of improper means [under Section 935], including the use of Wayman's SDU program files, in relation to that project. Thus, Wayman is not entitled to actual damages in the form of lost profits from the Doylsetown upgrade project.").

Per the instructions in the DLA's solicitation, the Government Bid offered two scenarios for supplying the part needed by the DLA, from which the DLA would select one or the other: the first, a five-year option contract for supplying the part in small batch orders, which included one base year and options for the DLA to extend the contract every year for four years; and the second, a one-time, bulk order for the part.[153] Under the first scenario, the DLA guaranteed it would order *at least* 18 units in the base year, but estimated that it would *actually* order 72 units in the base year, as well as in each additional year it opted to extend the contract, and Base DBA Argus quoted that it would supply the part at $970 per unit.[154] Under the second scenario, the DLA would place a single, large order for 2,540 units, and Base DBA Argus quoted that it would supply the part at $597 per unit.[155] Based on these scenarios, I find it more likely than not that Base DBA Argus would have received an order from the DLA for its estimated need of 72 units in the first, guaranteed year of the annual supply contract, and thus Base Optics is entitled to the profits it would have received for these units. Again using 30% as a reasonable measure of Base Optics' profit margin because Base Optics has not provided evidence as to its specific margin on these units, I award Base Optics

---

[153] *See* JX 130 at ARG000040, 50 (the Government Bid); Trial Tr. 240:4–241:12 (Perry).
[154] JX 130 at ARG000040–41.
[155] *Id.* at ARG000050.

$20,952 in damages.[156]  I find that potential profits for the "large order" scenario, or profits on non-guaranteed option-year orders, are too speculative to support an award of damages.

Further, I find that the record does not reflect that the Defendants' violation of Section 934 was "willful and malicious," and thus Base Optics is not entitled to treble damages under Section 941(c).  The computer crimes statutes do not define "willful" or "malicious," but this Court in a previous Section 941(c) action has applied the definition of these words used in the analogous misappropriation of trade secrets context, where our courts have defined "willful" to mean "an awareness, either actual or constructive, of [one's] conduct and a realization of its probable consequences," and "malicious" to mean "ill-will, hatred or intent to cause injury."[157]  While Liu's own testimony reveals that her actions were willful—that she was aware of the consequences of her actions in changing the passwords for the Argus Email Accounts, and indeed intended to cut off Base Optics from those accounts—I do not find that her actions were taken with malice. The record demonstrates that Liu took over the Argus Email Accounts in order to help herself and her company, Argus, regain the business of the DBA Customers;

---

[156] Base Optics has not sufficiently demonstrated any other lost profits arising from the Defendants' violation of Section 934. *See supra* notes 125–28 and accompanying text.

[157] *Wayman Fire Prot., Inc.*, 2014 WL 897223, at *18 (quoting *Beard Research, Inc. v. Kates*, 8 A.3d 573, 600 (Del. Ch. 2010), *aff'd sub nom., ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010)).

the record does not reflect that Liu was motivated by ill-will or hatred towards Base Optics or its principals, or that Liu specifically intended to cause them harm,[158] though she must have been aware that some financial harm would result. Because Liu's actions were not both "willful *and* malicious," Base Optics is not entitled to treble its statutory damages.

### 3. Unjust Enrichment

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[159] "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[160]

Based on the credible testimony of Myrick and Sandstrom and the Base Optics invoices in the record, Base Optics has proven by a preponderance of the evidence that the Defendants failed to remit to Base Optics seven payments that the Defendants received from Hach, each for $405, and that these payments pertained

---

[158] *See Wayman Fire Prot., Inc.*, 2014 WL 897223, at *18 ("Even assuming that White's misuse was willful, I am not persuaded that any of his conduct in this case was malicious. . . . White brought the Wayman files he had assembled over the course of his career there to Premium Fire because he believed it would help him in his new job, not because he harbored any ill-will or hatred towards Wayman or intended to harm Wayman.").

[159] *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 891 (Del. 2009) (internal quotation marks omitted).

[160] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

to orders for which Base Optics booked and fronted the cost. Allowing the Defendants to retain these funds, simultaneously enriching the Defendants for work they did not complete and depriving Base Optics of both its costs for the parts and the profit of its labor, offends fundamental principles of justice, equity, and good conscience. Liu offered no justification for withholding these funds besides her belief that they pertained to orders booked by Argus prior to the parties entering the Original Agreement; however, as I have stated above, I find it more likely than not Liu is wrong in this regard. Finally, although the parties have a contract that governs their relationship, I do not find that the Defendants' obligations under that contract stretch so far as to require the Defendants to turn over checks it mistakenly received from one of the DBA Customers.[161] Thus, Base Optics has no adequate remedy at law. Base Optics is entitled to damages in the amount that the Defendants were unjustly enriched by retaining the funds, the entire value of the seven payments, totaling $2,835.

---

[161] The Amended Agreement granted Base Optics the exclusive right to transact business with the DBA Customers, but here the Defendants did come into possession of the checks by soliciting or otherwise attempting to transact business with Hach; rather, Hach mistakenly sent the Defendants the checks. Equity, not the Amended Agreement, speaks to the Argus's obligation to turn over Base Optics' checks that it mistakenly received. *See, e.g., Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 891 (Del. Ch. 2009) ("A claim for unjust enrichment is not available if there is a contract that governs the relationship between the parties *that gives rise to the unjust enrichment claim*. In other words, *if 'the contract is the measure of [the plaintiff's] right*, there can be no recovery under an unjust enrichment theory independent of it." (emphasis added)).

Base Optics additionally pled, but did not demonstrate at trial, that it is entitled to disgorgement of certain optical lenses purportedly held by Argus or Liu, under a theory of unjust enrichment or conversion. To the extent this claim has not been abandoned, Base has failed to demonstrate that the Defendants possess such lenses.

### 4. Remaining Claims

Base Optics initially sought alternative claims for misappropriation of trade secrets, tortious interference with business and contractual relationships, conversion, breach of fiduciary duty, and defamation. To the extent the facts support such claims, damages would be coextensive with and cumulative of the damages found above; where further damages might have been implicated—defamation, for example—the claims, to the extent not abandoned, fail for lack of proof.

### 5. Other Relief Sought

In addition to damages and disgorgement, Base Optics has asked the Court to grant a variety of other forms of equitable relief, including a declaratory judgment, accounting, a mandatory injunction, and specific performance. However, Base Optics' briefing as to appropriate imposition of equitable relief is unclear. The parties should confer on an appropriate form of order regarding equitable relief consistent with this Memorandum Opinion. It is my anticipation

that, with the guidance of this Memorandum Opinion, the parties will be able to agree on condign relief; if not, they should so inform me.

Similarly, Base Optics seeks recovery of its attorney's fees and costs under both the Amended Agreement and under the computer crimes statutes at 11 *Del. C.* § 931 *et seq.*; both mandate the shifting of Base Optics' reasonable attorney's fees to the Defendants.[162] The parties should confer on a schedule for Base Optics to submit to the Court an affidavit showing its reasonable attorney's fees and costs, and for the Defendants to respond.[163]

Finally, Base Optics has indiscriminately asked the Court to pierce the corporate veil of any and all of Liu's solely owned companies, including Y&M, Argus Photonics, Ekon USA, and Accina, so that Liu may not hide, and Base Optics may recover, the Defendants' assets satisfying the damages Base Optics is owed.[164] Delaware takes corporate formalities seriously,[165] and there is nothing in this instance to show that the Court should disregard the corporate form for any of

---

[162] *See* JX 12 § 5(c) (the Original Agreement) ("If either party employs attorneys to enforce any rights arising out of or relating to this agreement, the losing party *shall* reimburse the prevailing party for its reasonably attorneys' fees and costs." (emphasis added)); JX 22 § 5 (the Amended Agreement) ("Except as expressly modified and supplemented by this amendment, all other terms and conditions in the Original Agreement remain in full effect and continue to be binding on the parties."); 11 *Del. C.* § 941(e) (In any civil action brought under this section, the Court *shall* award to any aggrieved person who prevails reasonable costs and reasonable attorney's fees." (emphasis added)).

[163] Since I find that Base Optics is entitled to fee shifting by contract and statute, Base Optics' Second Motion for Contempt and Sanctions is moot.

[164] *See* Pl. Base Optics Inc.'s Post-Tr. Opening Br. at 39.

[165] *See, e.g., Wallace ex rel. Cencom Cable Income Partners II, Inc. L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task.").

57

Liu's companies: Although Liu evidenced the intent to use Argus Photonics to surreptitiously take back the DBA Customers' business, nothing in the record demonstrates that she actually used Argus Photonics, or any other entity besides Argus, to carry out the harm alleged in this case.[166] Therefore, Base Optics is not entitled to the extraordinary equitable remedy of piercing the corporate veil.

### B. The Defendants' Counterclaim

The Defendants failed to develop their counterclaim at trial or in post-trial briefing, nor did they make any request for monetary damages (other than a request for attorney's fees) in post-trial briefing, and thus I find that the Defendants have failed to meet their burden to obtain relief on their counterclaim.

### III. CONCLUSION

The Defendants—Liu and her company, Argus—entered into a contract with the Plaintiff granting the Plaintiff the right to service Argus's customers in return for royalties. While that contract held some advantages for Liu, she quickly became dissatisfied with it, entered an amended contract with the Plaintiff abandoning the royalties scheme, and then became disenchanted with that as well. It became obvious during the course of this litigation that she believes she received a bad deal.

---

[166] *See, e.g., id.* at 1184 ("Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." (footnote and internal quotation marks omitted)).

Delaware law is contractarian. With limited public policy exceptions, we enforce the contractual agreements of parties; good, indifferent or bad.[167] Liu, not liking the deal she negotiated, resorted to self-help in a manner I have found wrongful, which led to recoverable damages and relief as found above. The parties should confer and apprise me of what issues remain to be addressed consistent with this Memorandum Opinion.

---

[167] *E.g. Miramar Police Officer's Ret. Plan v. Murdoch,* 2015 WL 1593745, at *9 (Del. Ch. April 7, 2015).